UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICIA CAPUTO<br><br>             Plaintiff,<br><br>     v.<br><br>AMAZON.COM SERVICES, LLC and SEDGWICK CLAIMS MANAGEMENT SERVICES, INC.,<br><br>             Defendants. | No. 1:23-CV-01346-KES-CDB<br><br>ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT<br><br>Docs. 47, 52, 55 |

This action concerns plaintiff Patricia Caputo's claims against defendants Amazon.com Services, LLC ("Amazon") and Sedgwick Claims Management Services, Inc. ("Sedgwick") for alleged employment law violations following Caputo's workplace injury in December 2021. This action proceeds on Caputo's First Amended Complaint ("FAC"), which alleges five claims against Amazon and Sedgwick: (1) discrimination, (2) retaliation, (3) failure to accommodate, and (4) failure to engage in the interactive process, all under California's Fair Employment and Housing Act ("FEHA"), and (5) retaliation in violation of California Labor Code § 1102.5.

Amazon and Sedgwick move for summary judgment against Caputo as to all claims. Docs. 52, 55. Caputo moves for partial summary judgment against Amazon and Sedgwick as to her (1) FEHA failure to accommodate and (2) FEHA failure to engage in the interactive process claims, and as to her claim for punitive damages. Doc. 47. All parties filed oppositions and

replies to the motions. Docs. 53, 54, 57, 58, 59, 60, 63, 64. The Court heard oral argument on July 7, 2025. For the reasons explained below, Amazon and Sedgwick's motions are granted and Caputo's motion is denied.

I. **Background**

On October 12, 2021, Caputo began working for Amazon as a Fulfillment Associate at its BFL1 Fulfillment Center (hereinafter "BFL1") in Bakersfield, California. Amazon's Statement of Material Facts and Caputo's Response, Doc. 59-1 ("SMF") No. 1. BFL1 is an approximately 2.6 million square foot Amazon facility used to fulfill customer orders. *Id.* Nos. 2–3. Caputo was regularly scheduled for eight-hour shifts five times per week. *Id.* No. 4. Caputo's role consisted of picking and packing customer orders, handling products up to forty-nine pounds in weight and reaching shelves up to eighty inches in height. *Id.* Nos. 3, 5. Caputo was also required to walk throughout the warehouse, kneel or squat to retrieve items, and stand to reach over tall boxes to place the items inside. *Id.* No. 6. Caputo also loaded boxes for delivery and used a pallet jack to move items. *Id.* No. 9. Caputo's Fulfillment Associate role potentially required standing and walking for up to ten to twelve hours and frequent squatting and kneeling. *Id.* No. 10.

On December 12, 2021, while pulling a pallet, Caputo experienced a "knee pop." *Id.* No. 23. Caputo reported the pain to Amazon's first aid service, "Amcare." *Id.* No. 24. Caputo completed an "Initial Injury Report" form at Amcare, received medical care, and was instructed on how to submit a workers' compensation claim. *Id.* No. 26. Caputo continued to work at BLF1 using a knee brace AmCare provided her on December 13, 2021. After experiencing increasing pain, Caputo returned to AmCare on December 28, 2021, and sought a referral to a medical provider. *Id.* No. 28. Amazon arranged car transportation for Caputo to see a doctor at Central Valley Occupational Medical Group ("Central Valley"). *Id.* No. 29. That day, Caputo saw a Central Valley medical provider who found that Caputo's injuries were indicative of a compromised ACL and MCL. Doc. 59-3 at 30.[1] In addition to medication, the medical provider

---

[1] Caputo was eventually diagnosed, on March 14, 2022, with a tear of her medial meniscus in her left knee and Grade 4 cartilage loss. Doc. 59-3 at 89.

2

prescribed Caputo "left knee restrictions," including "no bending or twisting, no kneeling or squatting, [and] no prolonged standing / walking 60% of her shift." *Id.* at 32. Later that same day, Caputo submitted a workers' compensation claim. SMF No. 31.

Amazon assigned Sarah Merrill as Caputo's workers' compensation case manager. *Id.* No. 32.[2] On January 3, 2022, Merrill emailed Caputo information about the accommodation and workers' compensation process, including how to contact Merrill, submit work restrictions to Amazon, and contact Sedgwick, Amazon's third-party claims administrator. *Id.* No. 33. That same day, Caputo submitted a document to Amazon detailing her December 28, 2021 work restrictions. *Id.* No. 34. On January 6, 2022, Amazon's Workplace Health and Safety ("WHS") team reviewed Caputo's restrictions but identified no role modification within the provided restrictions that would allow Caputo to perform her Fulfillment Associate role. *Id.* No. 35. Because Caputo was unable to perform the typical physically demanding functions of her Fulfillment Associate role, with or without an accommodation, Amazon assigned Caputo to a temporary light duty ("TLD") assignment referred to as "Asset Tagging." *Id.* No. 43.[3] In the Asset Tagging assignment, the employee sits at a desk reviewing customer receipts on a computer, making notations regarding matters such as dates or amounts. *Id.* No. 44.

Caputo began the Asset Tagging assignment on January 6, 2022. *Id.* No. 43. At the BFL1 warehouse, the desk where Caputo was assigned was located in the center of the warehouse, requiring her to walk for several minutes to get to the desk. *Id.* No. 44. On January 7, 2022, Caputo informed Merrill that she was unable to reliably obtain Uber or Lyft transportation to arrive to work by her scheduled start time of 4:30 AM, and she requested to start at 12:30 AM

---

[2] Amazon's workers' compensation managers are employed by Amazon and liaise among the employee, Sedgwick (Amazon's third-party claims administrator), and Amazon's Workplace Health and Safety team. Doc. 52-33 at 2.

[3] TLD is a temporary assignment that, for a maximum of 180 days, allows an Amazon employee to perform other tasks while recovering from his or her injury. SMF No. 37. TLD tasks are not individual roles or positions, and Amazon does not hire or advertise for such tasks or positions. *Id.* No. 39. TLD is available only for employees who cannot perform their primary roles with or without an accommodation, so that they can continue to temporarily work while recovering. *Id.* No. 40.

1  instead. *Id.* No. 47. Amazon agreed to change Caputo's start time to 12:30 AM. *Id.* No. 48.
2  Caputo's desired change in start time was the only concern that she raised to Amazon during her
3  Asset Tagging assignment. *Id.* No. 49.

4  From January to July 2022, Caputo consulted with her physician at Central Valley seven
5  times and submitted updated medical restrictions to Sedgwick, which would send them to
6  Amazon. *Id.* Nos. 50–54. Caputo also provided Amazon with physical copies of her work
7  restrictions before she began her shifts. Doc. 52-5 at 35–36. Following her first five visits to
8  Central Valley, from January to May 2022, Caputo's medical provider prescribed her "no
9  kneeling or squatting," and "limited prolonged standing/walking 50% of the time" restrictions.
10 SMF Nos. 50–54. Following her sixth and seventh visits, in June and July 2022 respectively, the
11 medical provider prescribed the same restrictions, as well as noting, "may ice knee during sit
12 down duty task." *Id.* Nos. 52–53. Caputo's TLD assignment complied with these restrictions.

13 On June 27, 2022, Caputo, after consultation with her workers' compensation counsel,
14 executed a Compromise & Release ("C&R") agreement, which she provided to Sedgwick,
15 resolving her workers' compensation claims. *Id.* No. 57; Doc. 55-3 at 116–36. That agreement
16 provided: "Patricia Caputo ("Employee") hereby submits the following resignation: Employee
17 voluntarily separates Employee's employment with Amazon effective upon OACR issuance."[4]
18 SMF No. 58; Doc. 55-3 at 136. Under the terms of the C&R, Caputo also received a $40,000
19 payment from Amazon in settlement of her workers' compensation claims. SMF No. 58. In her
20 deposition, Caputo stated that she understood the C&R agreement to mean she "was voluntarily
21 separating from Amazon." Doc. 52-5 at 64.

22 On July 6, 2022, after Caputo executed the C&R agreement, but before the workers'
23 compensation judge issued the OACR, Caputo exhausted the 180-day limit in her Asset Tagging
24 TLD role. SMF No. 60. That day, Merrill sent Caputo an email stating that "the site is no longer
25 able to accommodate [her] restrictions"—that is Caputo was unable to continue her Asset
26 Tagging role—and that she would "need to initiate a Leave of Absence ("LOA") within 24 hours

---

[4] "OACR" stands for the Order Approving Compromise and Release, to be issued by the workers' compensation judge upon the judge's approval of the settlement.

4

of receiving this email." Doc. 59-3 at 157.  The email also stated that if she did not initiate a leave of absence within 24 hours, Caputo would be subject to Amazon's attendance policy.[5]  *Id.*  Merrill's email provided instructions on how to initiate a leave of absence.  *Id.*  Caputo initiated her leave of absence the same day, July 6, 2022, and began her leave on July 8.  SMF Nos. 62–63; Doc. 52-28.  Three days later, on July 11, the workers' compensation judge issued the OACR approving the C&R agreement.  *Id.*

On July 27, 2022, Sedgwick's Claims Representative, Lexus Newhouse, notified Merrill by email that the workers' compensation judge had issued the OACR.  Doc. 52-37 at 3.[6]  That same day, Merrill responded "WOOHOO! Thank you!" to Newhouse's email.  *Id.*  However, Amazon did not process Caputo's separation until several months later, and, in the meantime, Caputo voluntarily returned to her Fulfillment Associate role at BFL1 on August 26, 2022.  SMF No. 70.  Three days later, on August 29, 2022, after she had resumed working, Amazon's Disability and Leave Services ("DLS") emailed Caputo that her leave of absence had concluded and that she could "return to work on [her] next scheduled workday following August 25, 2022."  *Id.* No. 73.  That email also advised Caputo to contact DLS if she "believe[d] [she was] receiving [the] email in error."  *Id.* No. 74.

Despite the OACR issuance on July 11, 2022, and Newhouse's email to Merrill on July 27, 2022, Sedgwick did not provide Amazon with a copy of Caputo's C&R agreement until October 14, 2022, after Merrill realized that Caputo was still employed with Amazon and reached out to Newhouse inquiring as to Caputo's status.  Doc. 52-37 at 2.  Newhouse responded that day and provided Amazon with a copy of the executed C&R agreement.  *Id.*  Caputo had not directly informed anyone at Amazon that she had signed a C&R agreement or that she had agreed to

---

[5] Amazon's Attendance Policy states: "If an associate has not reported to work or called in for three (3) consecutive workdays, in most cases the company will consider the associate to have resigned, and employment will be terminated."  Doc. 59-3 at 337.

[6] The email incorrectly stated that the OACR was issued on July 12.  The parties agree that the OACR was issued on July 11, 2022.  SMF No. 63.

5

1   voluntarily separate her employment effective upon the issuance of the OACR.[7]  SMF No. 75.
2   Merrill did not review Newhouse's October 14 email, or the C&R showing Caputo's agreement
3   to voluntarily separate, until December 1, 2022.  *Id.* No. 81.  After Merrill reviewed the email and
4   the C&R agreement on December 1, she sent the BFL1 Human Resources Team ("HR") a copy
5   of the C&R agreement for them to process Caputo's resignation.  *Id.* No. 83.  Merrill followed up
6   with HR on December 5 and 7, 2022 to ensure that Caputo's resignation was being processed.
7   Doc. 59-3 at 312.  HR confirmed to Merrill on December 12, 2022 that they had processed
8   Caputo's resignation and had informed Caputo.  SMF No. 93; Doc. 59-3 at 311.
9       In November 2022, Caputo had requested a colonoscopy-related medical leave.  SMF No.
10  88.  Amazon's DLS team approved the request, but Caputo cancelled it a few days later.  *Id.*  On
11  December 6, 2022, Caputo contacted DLS by phone to initiate a medical leave request for a
12  colonoscopy that was to take place on December 9, 2022.  *Id.* No. 85.  That same day, Amazon
13  approved her request to take leave on December 9.  *Id.* No. 87.  Caputo was also not scheduled to
14  work on December 7 and 8.  *Id.*  In her deposition, Caputo states that the DLS representative
15  informed her over the phone that two-day leave was approved—for both December 9 and 10;
16  however, an email from DLS indicated that her leave was approved only for December 9.
17  Doc. 59-3 at 324.  Caputo successfully underwent a colonoscopy on December 9.  SMF No. 85.
18  Realizing she would need additional days to recover, Caputo also requested leave for
19  December 11 and 12.  Doc. 59-3 at 349.  In her deposition, Caputo states that her request was
20  approved.  *Id.*  However, on December 12, Amazon's HR notified Caputo that she had been
21  terminated effective December 6, 2022, the day of her last scheduled shift.  *Id.* at 283, 311, 335.
22  Amazon's termination letter noted that Caputo's termination was voluntary.  *Id.* at 335.
23      Caputo does not allege that Amazon failed to pay her for any of the time she worked for
24  Amazon, including when she returned to work from August 29, 2022 to December 6, 2022.  Nor
25  does she allege that she failed to receive the $40,000 settlement payment pursuant to her C&R
26  agreement.

---

[7] After executing her C&R agreement, Caputo never reapplied for employment with Amazon.
*See* SMF No. 76.  Nor did Amazon or Caputo ever purport to nullify the C&R agreement.  *Id.*

6

## II. Legal Standard

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party." *Momox-Caselis v. Donohue*, 987 F.3d 835, 841 (9th Cir. 2021) (internal quotations omitted) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 841. The parties must cite "particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1). The Court then views the record in the light most favorable to the nonmoving party and draws reasonable inferences in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

The party moving for summary judgment must first carry its initial burden of production. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If, as in this case, the moving party would not have the burden to prove the disputed claim at trial, then it must carry its initial burden of production at summary judgment in one two ways: "either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire*, 210 F.3d at 1102. Then, to carry its burden of persuasion on the motion, the moving party must "persuade the court that there is no genuine issue of material fact." *Id.*

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue exists as to a material fact. *Matsushita Elec. Indus. Co.*, 475 U.S. 585–87; *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968). In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank of Ariz.*, 391 U.S. at 288–89. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for

trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (quoting Rule 56(e) advisory committee's note on 1963 amendments). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587.

### III. Discussion

Caputo brings the following claims against Amazon and Sedgwick: (1) discrimination, (2) retaliation, (3) failure to accommodate, and (4) failure to engage in the interactive process, under California's Fair Employment and Housing Act ("FEHA"); and (5) retaliation in violation of California Labor Code § 1102.5. Amazon and Sedgwick move for summary judgment against Caputo as to all claims. Docs. 52, 55. Caputo moves for partial summary judgment against Amazon and Sedgwick as to her (1) FEHA Failure to Accommodate and (2) FEHA Failure to Engage in the Interactive Process claims, and as to her claim for punitive damages. Doc. 47. Before turning to the merits of these arguments, the Court addresses the parties' evidentiary objections.

#### A. Evidentiary Objections

##### 1. Amazon's Objections

Amazon raises objections to the evidence cited in Caputo's motion for summary judgment. Doc. 53-3. The objections are "garden variety evidentiary objections" such as relevancy, hearsay, foundation, and speculation. *See Torres v. Los Angeles Sheriff's Dept.*, No. CV 22-07450-MWF (MARx), 2024 WL 4720808, at *5 (C.D. Cal. Aug. 14, 2024).

"[A]t the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents." *Sandoval v. County of San Diego*, 985 F.3d 657, 666 (9th Cir. 2021). That is, though such objections could prove cognizable at trial, only the admissibility of the relevant facts at trial, not the form of these facts as presented in the motion, matters for purposes of a motion for summary judgment. *See id.* Where "the contents of a document can be presented in a form that would be admissible at trial—for example, through live testimony by the author of the document—the mere fact that the document itself might be excludable hearsay provides no basis for refusing to consider it on summary judgment." *Id.* (citations omitted).

1  To the extent that the Court relies upon evidence to which Amazon objects in deciding the motion for summary judgment, the objections are overruled. To the extent the Court does not, the objections are denied as moot.

### 2. Caputo's Objections

Caputo objects to the declaration of William Cansler in support of Amazon's motion for summary judgment, based on the sham affidavit doctrine. *See* Doc. 59-4. A party cannot avoid summary judgment by creating "an issue of fact by an affidavit contradicting [its] prior deposition testimony." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991). Caputo contends that Cansler's declaration should be disregarded, arguing that it is inconsistent with an interrogatory response by Amazon objecting to the disclosure of Cansler's identity during discovery. *See* Doc. 59-4. However, a generalized objection to an interrogatory is insufficient to exclude a subsequent declaration under the sham affidavit rule. *See Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998–99 (9th Cir. 2009) ("[T]he inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit."). Caputo fails to otherwise point to any prior contradictory testimony or affidavit by Cansler. Therefore, Caputo's objection is overruled.

### B. Amazon's Motion for Summary Judgment

Amazon moves for summary judgment as to Caputo's claims. Doc. 52. The Court addresses each claim in turn.

### 1. FEHA Discrimination

Under FEHA, it is unlawful for an employer "to discriminate against [a] person in compensation or in terms, conditions, or privileges of employment" because of a person's race, gender, or physical disability. Cal. Gov. Code § 12940(a). The California Supreme Court has adopted the tripartite burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) to analyze disparate treatment claims such as discrimination under FEHA. *See Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317 (2000).

Under *McDonnell Douglas*, the plaintiff has the initial burden of establishing a prima facie case of discrimination. *Lawler v. Montblanc North America, LLC*, 704 F.3d 1235, 1242

9

(9th Cir. 2013). To show a prima facie case for disability discrimination under FEHA, a "plaintiff must show that: (1) she is a member of a protected class; (2) she was performing competently in the position she held; (3) she suffered an adverse employment action, such as termination; and (4) some other circumstances that suggest a discriminatory motive." *Id.* (citing *Guz*, 24 Cal. 4th at 355). Once a plaintiff presents a prima facie case of these elements, the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the challenged adverse employment action. *Id.* If the employer articulates a legitimate reason for the challenged behavior, then the plaintiff must show the employer's offered explanation is pretextual by establishing that a discriminatory reason was the more likely explanation for the employer's action or by showing that the proffered explanation is not believable. *Id.*

When an employer moves for summary judgment, however, "the burden is reversed . . . because the defendant who seeks summary judgment bears the initial burden." *Id.* (quoting *Dep't of Fair Emp't & Hous. v. Lucent Techs., Inc.*, 642 F.3d 728, 745 (9th Cir. 2011)). Thus, to prevail on summary judgment, the employer is "required to show either that (1) plaintiff could not establish one of the elements of [the] FEHA claim or (2) there was a legitimate, nondiscriminatory reason for its decision to terminate plaintiff's employment." *Id.* "If the employer meets its burden, the discharged employee must demonstrate either 'that the defendant's showing was in fact insufficient or . . . that there was a triable issue of fact material to the defendant's showing.'" *Id.*

Here, Amazon has likely carried its burden in showing that Caputo cannot establish one of the elements of discrimination under FEHA because Caputo likely cannot show that she suffered an adverse employment action. It is true that termination of employment is typically an adverse employment action. However, in this case, Caputo's termination was the result of her voluntary separation agreement with Amazon, which a workers' compensation judge approved in July 2022, but that Amazon did not process until December 2022. Generally, a voluntary separation agreement does not constitute an adverse employment action. *See Featherstone v. S. Calif. Permanente Med. Grp.*, 10 Cal. App. 5th 1150, 1163 (2017) (collecting federal cases considering Title VII, which FEHA models, finding that "an employee cannot voluntarily submit a resignation

10

and then claim the employer's acceptance of the resignation is an adverse employment action.").

In ambiguous cases, where there is a genuine dispute of fact as to whether the employee intended to resign, or where the conditions of employment were so oppressive as to amount to constructive termination, courts have declined to find as a matter of law that such circumstances did not constitute an adverse employment action. *See e.g., Ruiz v. RSCR California, Inc.*, 683 F. Supp. 3d 1079, 1098 (C.D. Cal. 2023) (denying employer summary judgment where employee's resignation email to employer immediately followed employer's decision to deny the employee leave); *Quesada v. Albertson's LLC*, No. SACV 20-1407 PSG (DFMx), 2022 WL 2176512, at *7 (C.D. Cal. Feb. 1, 2022) (denying employer summary judgment where an email from employee had ambiguous language as to his intent to resign). That is not the case here. Here, the record indicates that Caputo knowingly and willfully signed a voluntary separation agreement with Amazon on June 27, 2022 to compromise, release, and settle her workers' compensation claims. In consideration for the settlement, Caputo received $40,000.

The Court need not make a finding as to whether Caputo has made out a prima facie case of discrimination under FEHA, however, because even if she has, Amazon has provided a legitimate non-discriminatory reason for Caputo's termination: the voluntary separation agreement. It is undisputed that Caputo executed her voluntary separation agreement in June 2022, and that the workers' compensation judge approved it effective July 11, 2022. Caputo's termination in December 2022, while delayed from the OACR issuance in July 2022, was based on her C&R agreement. After Merrill realized Caputo was still employed at Amazon despite Caputo having signed the C&R agreement months earlier, Merrill reached out to Sedgwick on October 14, 2022 to inquire as to the status of Caputo's separation. Doc. 59-3 at 313. Upon reviewing the executed C&R agreement on December 1, 2022, Merrill emailed Amazon HR to have them process Caputo's termination, stating that the termination was per the voluntary separation agreement Caputo signed in June 2022. *Id.* at 312. In that email, Merrill also stated that Caputo should not have returned to work following the signing of her separation agreement in June 2022. *Id.* Merrill then followed up with HR twice, on December 5 and 7, 2022, because Caputo's status was still showing as employed. *Id.* While Amazon's HR ultimately processed

11

1   Caputo's termination on December 12, it noted that it was effective as of December 6, 2022, the
2   day of Caputo's last scheduled shift. *Id.* at 335.

3         Caputo has failed to establish a triable issue of fact indicating that Amazon's reason was
4   pretextual. Caputo argues that she was "discriminatorily terminated after Amazon's attendance
5   system incorrectly marked her absent for three days during her medical leave" in December 2022.
6   Doc. 59 at 18. But, as explained above, Amazon initiated Caputo's termination *before* she
7   requested leave on December 6. Additionally, Caputo had agreed on June 27, 2022 that her
8   voluntary resignation would be effective once the worker's compensation judge issued the
9   OACR, which occurred on July 11, 2022. Amazon's administrative delay in getting Caputo's
10  voluntary resignation agreement to the appropriate department, and the resulting delay in her
11  separation date from Amazon, does not change the fact that Caputo had agreed in writing to her
12  termination effective as soon as the OACR was issued. Given this context, the fact that Caputo's
13  termination was ultimately processed on December 12, and that she had submitted another
14  request for medical leave on December 6, "does not, without more, suffice also to satisfy the
15  secondary burden borne by the employee to show a triable issue of fact on whether the
16  employer's articulated reason was untrue and pretextual." *Loggins v. Kaiser Permanente*
17  *Internat.*, 151 Cal. App. 4th 1102, 1112 (2007).

18        Caputo points to internal Amazon correspondence from February 2, 2023, following
19  Caputo's request for unemployment benefits, in which an Amazon employee, William Cansler,
20  stated that Caputo was "terminated for [negative unpaid time-off] balance." Doc. 59-3 at 320.
21  However, Amazon attaches Cansler's sworn declaration, in which he states that he "accidentally
22  entered information regarding a different associate when responding to an internal ticket
23  regarding [Caputo's] unemployment benefit request." Doc. 52-39 ¶ 5. This assertion is
24  corroborated by the fact that, in the same message responding to the internal ticket, Cansler
25  included the contents of an email that was sent to the other associate in question, dated January
26  26, 2023, more than six weeks after Caputo's December 2022 termination. Doc. 59-3 at 320.

27        On this record, there are no material disputed facts undermining Amazon's evidence that
28  Caputo was terminated based on the voluntary separation agreement that she signed in June 2022.

1  Therefore, Amazon has carried its burden to establish a legitimate, nondiscriminatory reason for
2  Caputo's termination, and Caputo has failed to establish a genuine dispute of material fact as to
3  whether her termination was pretextual. Accordingly, Amazon is entitled to summary judgment
4  as to Caputo's FEHA discrimination claim.

### 2. FEHA Retaliation and Retaliation under California Labor Code § 1102.5

As with her FEHA discrimination claim, a predicate element of Caputo's retaliation claims under both FEHA and California Labor Code § 1102.5 is an adverse employment action by the employer against the employee. *See Ayala v. Frito Lay, Inc.*, 263 F. Supp. 3d 891, 911 (E.D. Cal. 2017); *Lawson v. PPG Architectural Finishes, Inc.*, 12 Cal. 5th 703, 713–14 (2022). For the reasons explained above, Caputo likely did not suffer an adverse employment action. Even if she did, Amazon has identified by clear and convincing evidence that Caputo's termination occurred for a legitimate, nonretaliatory reason—her voluntary separation agreement—and Caputo has failed to establish a triable issue as to these claims. *See Wilson v. City of Fresno*, 763 F. Supp. 3d 1073, 1104 (E.D. Cal. 2025) ("A FEHA retaliation claim is evaluated under the *McDonnell Douglas* framework on a motion for summary judgment."); *Lawson*, 12 Cal. 5th at 712 (clarifying that the framework under California Labor Code § 1102.6 applies to § 1102.5 claims, requiring an employer to "demonstrate by clear and convincing evidence that the alleged adverse employment action would have occurred for legitimate, independent reasons even if the employee had not engaged in protected whistleblowing activities.") (internal quotations omitted). Accordingly, Amazon is also entitled to summary judgment as to both Caputo's FEHA retaliation claim and her retaliation claim under § 1102.5.

### 3. FEHA Failure to Accommodate and FEHA Failure to Engage in the Interactive Process

Under FEHA, employers have a duty to reasonably accommodate their employees' physical disabilities. *Atkins v. City of Los Angeles*, 8 Cal. App. 5th 696, 721 (2017); Cal. Gov. Code § 12940(m). Employers must also "engage in a timely, good faith, interactive process with the employee . . . to determine effective reasonable accommodations." Cal. Gov. Code § 12940(n); *Nadaf-Rahrov v. Neiman Marcus Group, Inc.*, 166 Cal. App. 4th 952, 978 (2008).

However, FEHA is remedial, not punitive. *Scotch v. Art Inst. of California*, 173 Cal. App. 4th 986, 1019 (2009). Thus, to succeed on her claims for failure to accommodate and failure to engage in the interactive process, Caputo "must identify a reasonable accommodation that would have been available at the time the interactive process should have occurred." *Id.* at 1018; *see also Issaian v. J.B. Hunt Transport Servs., Inc.*, No. 2:20-cv-00732-SVW-MAA, 2021 WL 2450784, at *4 (C.D. Cal. May 4, 2021) (finding that plaintiff bears this burden on both FEHA failure to accommodate and failure to engage in interactive process claims); *Estrada v. KAG West, LLC*, No. 1:24-cv-00257-KES-CDB, 2025 WL 1939400, at *5 (E.D. Cal. July 15, 2025).

While not entirely clear in her briefing, Caputo appears to allege that Amazon and Sedgwick failed to provide her two reasonable accommodations: (1) a relocation of the TLD Asset Tagging position from the center of the BFL1 warehouse to eliminate the need for her to walk for more than five minutes; and (2) a continuation of the TLD Asset Tagging position beyond the 180-day limit that Amazon imposed. *See* Doc. 59 at 8–11.

As to the relocation of the TLD Asset tagging position, the evidence indicates that, while Caputo may have reported to her Central Valley medical provider that she was in pain when walking or standing for more than five minutes, Amazon did not receive any physician notes reflecting such concerns. Instead, Amazon received "work status summaries" that included Caputo's medical diagnosis, work restrictions, and orders, and that prescribed restrictions of "no kneeling or squatting," and "limited prolonged standing/walking 50% of the time." *See* Docs. 52-5 at 35–36; 55-3 at 41–92; 59-3 at 32. The restrictions did not limit Caputo to less than five minutes of walking or standing. Nor did Caputo request that accommodation from Amazon or Sedgwick at the time.[8]

It is reasonable for an employer to base its accommodations on the restrictions prescribed by the employee's medical providers. *See Allen v. Pacific Bell*, 212 F. Supp. 2d 1180, 1197 (C.D. Cal. 2002) (noting lack of case law or statutory support for the proposition that, under FEHA, an

---

[8] The accommodation that Caputo did seek at the time was a change in her shift start time from 4:30 AM to 12:30 AM, which Amazon promptly provided. *See* Doc. 59-1 at 32.

14

1  employer "must provide the plaintiff with the specific accommodations [she] proposes,
2  particularly where the accommodations are at odds with the doctor's restrictions presented to the
3  employer."). Amazon's Asset Tagging TLD assignment complied with the medical providers'
4  prescribed restrictions for Caputo, and Amazon had no duty to accommodate other concerns that
5  Caputo may have raised to her medical providers, particularly as she never raised with Amazon
6  the alleged need for such further accommodations.[9]

7  As to the contention that, in July 2022, Amazon unreasonably required Caputo to take
8  unpaid medical leave and end her Asset Tagging TLD assignment after 180 days, it is true that
9  "when an employee can work with a reasonable accommodation other than a leave of absence, an
10 employer may not require that the employee take a leave of absence." Cal. Code Regs. tit. 2,
11 § 11068(c); *see also Ravel v. Hewlett-Packard Enter., Inc.*, 228 F. Supp. 3d 1086, 1096 (E.D. Cal.
12 2017) ("[A]n employer's decision to place an employee on leave when she is able to work with
13 another reasonable accommodation 'cannot be described as a lawful accommodation of a physical
14 disability.'") (citing *Wallace v. County of Stanislaus*, 245 Cal. App. 4th 109, 134 (2016)).
15 However, less than two weeks before her TLD assignment expired, Caputo entered into a
16 voluntary separation agreement with Amazon and agreed that it would become effective upon the
17 issuance of the OACR, which occurred on July 11, 2022.

18 Caputo cannot establish a triable issue of fact as to whether she would have requested an
19 extension of her TLD assignment after it expired on July 6, 2022, when she had agreed on
20 June 27, 2022 to voluntarily end her employment with Amazon as soon as the workers'
21 compensation judge approved her settlement. Caputo sets forth no evidence to suggest that she
22 intended to rescind her separation agreement and return to work, nor that she had any legal basis
23 to do so. In her deposition, Caputo admits that, at the time Merrill informed her that her TLD
24 assignment was ending on July 6, she was fully aware of the separation agreement she had signed
25 on June 27. Doc. 47-1 at 176. Nor did Caputo object to Merrill's email that she would need to

---

[9] While, at times, Sedgwick's emails to Amazon mischaracterized Caputo's prescribed restrictions (e.g. changed "limited" to "no"), Amazon also directly received from Caputo the work status summaries, which correctly stated the restrictions. In any event, Sedgwick's errors in its emails were immaterial, as they did not impact Caputo's accommodations in her TLD position.

15

1  take a leave of absence.  *Id.*  Instead, Caputo contacted the relevant Amazon department to initiate
2  her leave of absence as of July 6.  *Id.*
3        Accordingly, Amazon is entitled to summary judgment as to Caputo's failure to
4  accommodate and failure to engage in the interactive process claims.

5      **C.**    **Sedgwick's Motion for Summary Judgment**
6        Sedgwick moves for summary judgment as to each of Caputo's claims.  Doc. 55.  As
7  explained above, Caputo fails to establish a genuine dispute of material fact as to her claims for
8  discrimination, retaliation, failure to accommodate, or failure to engage in the interactive process.
9  That finding also applies to Sedgwick, which acted as a claims administrator for Amazon.
10 Therefore, Sedgwick's motion for summary judgment is likewise granted in full for the same
11 reasons as set forth above.[10]

12     **D.**    **Caputo's Motion for Summary Judgment**
13       For the reasons set forth above, which show that defendants are entitled to summary
14 judgment on Caputo's claims, Caputo fails to establish that she is entitled to summary judgment
15 on her claims for failure to accommodate and failure to engage in the interactive process, and on
16 her claim for punitive damages.  Caputo's motion for partial summary judgment, Doc. 47, is
17 therefore denied.

18 ///
19 ///
20 ///
21 ///
22 ///
23 ///
24 ///
25 ///
26

---

27 [10] Given this finding, this Order need not address Sedgwick's argument that, as a middleman processing workers' compensation claims, it was not performing a FEHA-regulated activity.  *See*
28 Doc. 55-1 at 10–13.

Case 1:23-cv-01346-KES-CDB   Document 77   Filed 09/15/25   Page 17 of 17

**IV.** <u>**Conclusion and Order**</u>

For the reasons explained above:

1. Caputo's motion for partial summary judgment, Doc. 47, is DENIED;

2. Amazon's motion for summary judgment, Doc. 52, is GRANTED;

3. Sedgwick's motion for summary judgment, Doc. 55, is GRANTED;

4. The Clerk of Court is directed to enter judgment for defendants Amazon and Sedgwick; and

5. The Clerk of Court is directed to close this case.

IT IS SO ORDERED.

Dated:   September 15, 2025

_____
UNITED STATES DISTRICT JUDGE